**ENVIRONMENTAL DEFENSE FUND, INC., et al., Petitioners,**

v.

**UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, Robert H. Finch, Secretary, Respondents.**

**No. 23812.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1970.

Decided May 28, 1970.

Mr. Edward Berlin, Washington, D. C., with whom Mr. James W. Moorman, Washington, D. C., was on the brief, for petitioners.

Mr. Howard S. Epstein, Attorney, Department of Justice, with whom Messrs.

John L. Murphy, Chief, Administrative Regulations Section, Department of Justice, and William W. Goodrich, Asst. Gen. Counsel, U. S. Department of Health, Education and Welfare, were on the brief, for respondents.

Before FAHY, Senior Circuit Judge, and WRIGHT and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The pesticide DDT has been one of the most widely used chemicals to control various insect populations and to protect agricultural crops from destruction by insects. Recent scientifc studies have, however, raised serious questions about the effect on the environment and on human health of the continued use of DDT. Some experiments have demonstrated that DDT increased the incidence of cancer in mice, and a recent Government commission on pesticides concluded that "[t]he evidence for the carcinogenicity of DDT in experimental animals is impressive."[1]

On the basis of these recent studies, petitioners[2] here filed a petition with the Secretary of Health, Education and Welfare, under applicable statutory provisions,[3] proposing that the Secretary es-

---

1. Secretary's Commission on Pesticides and Their Relationship to Environmental Health, Report 471 (1967) (hereinafter cited as Mrak Commission Report).

2. Petitioners are six individuals and a corporation. The individual petitioners include five young mothers who presently or intend in the future to breastfeed their babies; these mothers seek elimination of DDT because mothers' milk presently contains excessive DDT residues up to twice the maximum average daily intake recommended as safe by the United Nations World Health Organization. Mrak Commission Report at 374. The sixth individual petitioner is an agricultural worker required to come into frequent—and allegedly dangerous—contact with DDT as a consequence of his occupation. Environmental Defense Fund, Inc., a nonprofit New York corporation, is made up of scientists and other citizens dedicated to the protection of man's environment and "seeks to assure the preservation or restoration of environmental quality on be-

half of the general public." Respondents have not seriously challenged either petitioners' standing to bring this action or the finality of the letter order which petitioners are contesting in this court, although respondents in their brief do express "reservations" on these issues. We do not share these reservations. See 21 C.F.R. § 120.32(a) and (b) (1969); Ass'n of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. ——, 428 F.2d 1093 (1970); Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); Scenic Hudson Preservation Conference v. F.P.C., 2 Cir., 354 F.2d 608 (1965); Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51 (1954).

3. 21 U.S.C. § 346a (1964).

tablish a "zero tolerance" for DDT residues in or on raw agricultural commodities. The Secretary rejected the petition as legally insufficient since petitioners had not shown any "practicable method" of removing the residues of the persistent pesticide DDT from raw agricultural commodities. Consequently, he refused to publish petitioners' proposal in the Federal Register, an action which would have triggered a series of informal and formal administrative procedures, including study of the proposal by a specially appointed committee of scientists and formal administrative hearings open to all interested parties.[4]

In this court, petitioners urge that the Secretary's order refusing to publish their proposal should be reversed on two grounds. First, they argue that their petition, properly interpreted, met all the statutory requirements, including that of "practicability." Second, they urge that the 1958 amendment to the Food, Drug and Cosmetic Act, which requires the Secretary to ban any food additive which is found to induce cancer in experimental animals (the Delaney amendment),[5] must be read to require the Secretary not merely to publish their proposal but to establish the "zero tolerance" forthwith.

## I

At the outset, we reject respondents' position that any action by HEW on petitioners' proposal must await action, in the first instance, by the Department of Agriculture. The federal government regulates the use of pesticides through two statutes, the Food, Drug and Cosmetic Act[6] (FDCA), administered by the Secretary of HEW, and the Federal Insecticide, Fungicide and Rodenticide Act[7] (FIFRA), administered by the Secretary of Agriculture.

FIFRA regulates the shipment of pesticides, called "economic poisons," in interstate commerce. Under the provisions of that Act, every economic poison marketed in interstate commerce must be registered. To be registered, an economic poison must meet certain requirements relating to labeling, agricultural usefulness, and safety. These requirements apply to all pesticides, whether or not used on food crops. FDCA regulates pesticides only to the extent of controlling the residue of a pesticide which can safely remain in or on raw agricultural commodities. The Act first prohibits shipments in interstate commerce of "adulterated" crops. 21 U.S.C. § 331. Raw agricultural commodities are considered "adulterated" if there are residues of pesticide chemicals in or on them. 21 U.S.C. § 342(a) (1). However, the Secretary of HEW is authorized to establish maximum permissible amounts, called tolerances, for pesticide residues; if the pesticide residue is below the tolerance, the commodity is not considered "adulterated." 21 U.S.C. § 346a.

The heart of the regulatory scheme lies in the establishment of these tolerances. Without detailing the elaborate procedures involved, we note that the Act provides two general commands to the Secretary of HEW in establishing tolerances. First, the Act directs the Secretary of HEW to establish tolerances "to the extent necessary to protect the public health." 21 U.S.C. § 346a(b). In making this judgment, the Secretary is required by the Act to consider the necessity for an adequate food supply, other ways in which the consumer might be affected by the same pesticide, and the opinion of the Secretary of Agriculture as to the agricultural usefulness of the pesticide involved. *Ibid.* Second, the general instruction to establish tolerances is modified by the authorization to establish a zero tolerance—a ban on any residue at all—"if the scientific data before the Secretary does not justify the establishment of a greater tolerance." *Ibid.* In the words of both Senate and House Reports on this legislation:

"Before any pesticide-chemical residue may remain in or on a raw agri-

---

4. 21 U.S.C. § 346a(g) and (d) (5).

5. 21 U.S.C. § 348(c) (3) (A) (1964).

6. 21 U.S.C. § 301 *et seq.* (1964).

7. 7 U.S.C. § 135 *et seq.* (1964).

cultural commodity, scientific data must be presented to show that the pesticide-chemical residue is safe from the standpoint of the food consumer. The burden is on the person proposing the tolerance or exemption to establish the safety of such pesticide-chemical residue." [8]

■ While it is obvious that the responsibilities of the two Secretaries are interrelated and ought to be coordinated, we think their individual responsibilities are quite clear and quite separate. The Secretary of HEW is given the primary responsibility for determining the amount of residue of a pesticide which can safely—from the viewpoint of the food consumer—be left on raw agricultural commodities. It is true that in establishing a tolerance the Secretary of HEW must take into account the Agriculture Secretary's opinion regarding the agricultural usefulness of the pesticide, but that is only one of many factors which HEW must consider. In our judgment, the Act's language requires that HEW make its own independent judgment, based on public health considerations, as to the tolerance which should be set for pesticide residues on raw agricultural commodities and not abdicate its responsibility to the Department of Agriculture.[9]

The legislative history supports this conclusion and makes clear beyond peradventure that Congress intended to lodge primary responsibility for public health considerations with the Secretary of HEW. The present pesticide provisions of the FDCA were added by amendment in 1954. The reports of both Houses of Congress on the 1954 amendments stressed that one of the main goals of that legislation was to define clearly departmental responsibilities:

> "The principal respects in which this bill would change and improve existing law are—
>
> \* \* \* \* \* \*
>
> "2. The determination of questions of agricultural usefulness and probable residue levels involved in the establishment of tolerances, is made a function of the Department of Agriculture; while the determination of questions of a public health nature remains a function of the Department of Health, Education, and Welfare. \* \* \* " [10]

If Congress intended that either department defer to the other, the House and Senate reports suggest that ordinarily Agriculture's decisions as to whether to register a pesticide under FIFRA for use on food crops should depend upon HEW's decision to grant a tolerance.[11]

---

8. H.R.Rep. No. 1385, 83rd Cong., 2d Sess., 5 (1954) ; S.Rep. No. 1635, 83rd Cong., 2d Sess., 4 (1954) ; 2 U.S.Code Cong. & Ad.News, p. 2629, 83rd Cong., 2d Sess. (1954).

9. The Secretary of Agriculture is also required to take safety into account in determining whether to register pesticides, although the statutory framework is somewhat involuted. The Secretary must approve the labeling of the pesticide, and FIFRA prohibits interstate shipment of "misbranded" pesticides. Section 135(z) (2) (g) of Title 7, U.S.C., provides that an economic poison is "misbranded"

> "if in the case of an insecticide, nematocide, fungicide, or herbicide when used as directed or in accordance with commonly reognized practice it shall be injurious to living man or other vertebrate animals, or vegetation, except weeds, to which it is applied, or to the person applying such economic poison \* \* \* "

*See also* 7 U.S.C. § 135(z) (2) (h). In addition, the Secretary of Agriculture may suspend registration of any economic poison immediately "when he finds that such action is necessary to prevent an imminent hazard to the public." 7 U.S.C. § 135b(c). We in no way minimize Agriculture's broad responsibility to ensure that "economic poisons" do not endanger workers, other vertebrate animals, etc. As the discussion in text makes clear, however, both departments must independently discharge their statutory responsibilities.

10. H.R.Rep. No. 1385, *supra* Note 8, at 5 ; S.Rep. No. 1635, *supra* Note 8, at 4, U.S. Code Cong. & Admin.News 1954, p. 2629.

11. The Congressional Committee Reports summarized the departmental responsibilities as follows:

> "Under this bill [the present FDCA provisions], a regulation establishing a tolerance for a pesticide chemical used

■ Respondents suggest, however, that the problem posed by DDT's "persistence" somehow alters these basic responsibilities. They argue that, as a result of DDT's persistence, DDT remains in the air, water and soil for a sufficient length of time to be carried over from season to season and from one crop to another. As a result, according to this argument, DDT must first be deregistered by Agriculture, and the chemical allowed to gradually disappear, before HEW can reasonably enact zero tolerances. We note in passing that this argument would apparently mean that HEW would *never* have to act since, according to the argument's premise, DDT would have disappeared.

But, in any event, we do not see how the fact that there is a new, and quite difficult, dimension present in any decision to revise present DDT tolerances operates to relieve HEW of its statutory responsibility. DDT's persistence will obviously affect any action taken by HEW; in all probability it will require that agency to bring creativity and imagination to bear in the search for a workable solution to the problem. But HEW's present posture would require the Department of Agriculture to weigh all the public health concerns which Congress intended that HEW assess.

One of the strengths of administrative agencies has always been thought to be the expertise which reposes in specialized administrators.[12] Presumably that was one of the reasons Congress thought it wise to divide responsibilities for different aspects of pesticide regulation between the Departments of Agriculture and HEW: each has a particular specialty and focus. For either department to relinquish its responsibility would destroy the regulatory scheme enacted by Congress. Consequently, we believe that HEW had and continues to have a responsibility to appraise the continuing safety of pesticide tolerance levels; it should, of course, continue to coordinate its operations with the Department of Agriculture, as it presently does. But it may not relinquish or evade its own responsibilities.

## II

The Commissioner of Food and Drugs, acting as the delegate of the Secretary of HEW, rejected petitioners' petition on the ground that it did not satisfy Section 408(d) (1) (E) of the FDCA, 21 U.S.C. § 346a(d) (1) (E), which requires data showing "practicable methods for removing residue which exceeds any proposed tolerance." [13] This alleged defi-

on raw agricultural commodities may be initiated by an applicant for registration of an economic poison under the Federal Insecticide, Fungicide, and Rodenticide Act or by the Secretary of Health, Education, and Welfare. *It is anticipated that, in the usual case, registration of a new economic poison would be withheld by the Department of Agriculture pending the issuance of the tolerance.*

H.R.Rep. No. 1385, *supra* Note 8, at 3, U.S.Code Cong. & Admin.News 1954, p. 2628. (Emphasis added.) Similarly, the Department of Agriculture should presumably deregister a pesticide for use on food crops if HEW revokes an existing tolerance. Precisely this pattern was followed recently when Agriculture revoked registrations of lindane and benzene hexachloride for use on certain crops because HEW had cancelled tolerances for these pesticides. USDA Release No. 943–70, March 25, 1970.

12. L. Jaffe, Judicial Control of Administrative Action 25–26 (1965).

13. The full text of the Commissioner's letter reads:
"This refers to Pesticide Petition No. OEO894, requesting that zero tolerances be established for residues of DDT on raw agricultural commodities.
"In a report to the Secretary of Health, Education, and Welfare, dated November 1969, the Commission on Pesticides and Their Relationship to Environmental Health recommended the elimination of all nonessential uses of DDT, i. e., its use be limited to the prevention or control of human disease and other essential uses for which there are no alternatives available. However, the Commission recognized that unavoidable residues of DDT from past uses will continue to be present in the soil, water, air and food supplies for a period of years, and thus that it is not practical

ciency also derives from the fact that DDT is a "persistent" pesticide, *i. e.*, it does not decay quickly, but remains in its toxic form in the environment (and increasingly in human bodies) for a period of years. Thus even if all applications of DDT were to cease tomorrow, substantial and detectable residues of DDT would apparently continue to exist in many raw agricultural commodities. Under these circumstances, establishing a zero tolerance for DDT on all commodities, effective immediately, would mean that a substantial proportion of food in the United States would still be "adulterated" within the meaning of the FDCA.

In their supplement to their petition, however, petitioners made clear that they were not seeking this infeasible, major disruption of the country's food supply. Specifically, they suggested:

> " * * * ` At a minimum, the Secretary should establish a zero tolerance for DDT and its residues on all raw agricultural commodities with the possible exemption from seizure of any commodities in which it can be established that any residues are the consequence of applications of DDT that were made prior to the announcement by the Secretary of the zero tolerance."

This is certainly one possible solution leading to the gradual elimination of a persistent pesticide from the environment.

In any event, we think HEW's emphasis on the "practicability" requirement is seriously misplaced, as disclosed by the most cursory examination of the legislative history of the provision. Both House and Senate reports empha-

size that the formal requirements for a petition are to be flexibly administered in the interest of safeguarding the public health:

> "It is intended that a rule of reason should dictate the nature and extent of the information which should be submitted with a petition. What is contemplated is data adequate to permit an accurate appraisal of safety to protect the public health. In this respect the data as to a particular chemical will depend upon many variable factors, including its physical and chemical properties, recommended purpose, toxicity, and rate of disappearance. The emphasis to be placed on any such factor will similarly depend on the particular pesticide chemical under consideration and its proposed usage. * * * " [14]

In our judgment, the Commissioner of Food and Drugs failed to apply a "rule of reason" in assessing the present petition. Instead of publishing petitioners' proposal, which would begin an administrative process designed to bring forth constructive alternatives for dealing with an admittedly difficult but vitally important problem, the Commissioner chose to stop petitioners at the door. Moreover, he chose to rely on a requirement which cannot be applied literally to the present case. Everyone agrees that there is no way to remove DDT from the environment *immediately*. The questions to be answered are how great is the present danger and what steps ought to be taken immediately in response to that danger.

These are basically matters for exploration and judgment which in the last analysis will rest with HEW. But there

---

to attempt to eliminate the residues of persistent pesticides from food by the establishment of zero tolerance limits. Plans are currently being developed to implement this recommendation of the Commission. We enclose a copy of the White House announcement of the Environmental Quality Council's review of the report by the Commission on Pesticides. We believe the steps outlined are the most reasonable steps that should be taken at this time.

"In the absence of a showing that establishing the zero tolerances you request would be practical, we find that you have not presented reasonable grounds to support the proposed action. Accordingly, a proposal based on the above petition is not being published."

14. H.R.Rep. No. 1385, *supra* Note 8, at 8; S.Rep. No. 1635, *supra* Note 8, at 8, U.S. Code Cong. & Admin.News 1954, p. 2633.

was no further information or data regarding these matters which HEW could reasonably seek to have petitioners produce. They have already submitted "data adequate to permit an accurate appraisal of safety to protect the public health." What remains to be developed are reasonable approaches to the problem. Petitioners in fact endeavored to suggest one —a zero tolerance with exemptions for residues attributable to DDT applications made before the establishment of the tolerance. Another approach, suggested by the Secretary's Commission on Pesticides and Their Relationship to Environmental Health and quoted in respondents' brief, is to announce immediately a gradual stepwise reduction of permissible residue levels to be effective on a prospective basis.[15] Yet another approach might be to announce a zero tolerance level to be effective at some time in the future.

Moreover, it is clear from the present regulations that the effect of the present level of environmental contamination does not affect all foods similarly, since there are, at present, different levels of DDT tolerances for different commodities.[16] Therefore, it may also be possible to deal differently with different categories of foodstuffs.

None of these alternatives has been considered in specific detail, with opportunity for comment and study by all interested parties. The administrative process, the process which Congress intended to focus on and illuminate these problems, has not been permitted to begin. In our view, the petition does comply with all statutory prerequisites, and this case must, therefore, be remanded to the Secretary of HEW with directions to file petitioners' proposal and to publish it in the Federal Register, as provided in 21 U.S.C. § 346a(d) (1).

### III

Petitioners here argue that any remand order should not permit the Secretary to consider "whether it is appropriate to continue, for any period of time, using DDT; rather, the Secretary should consider only the solution that should be implemented to afford the consuming public the greatest possible protection from continued exposure to that cancer-producing poison." Petitioners contend that this result is compelled by 21 U.S.C. § 348(c) (3) (A), the so-called Delaney amendment, which requires the Secretary to ban any *food additive* which has been found to cause cancer in experimental animals.[17] Since we have decided that a remand is necessary, we think it appropriate to indicate our views on this question.

Several related events which occurred in the late 1950's form the basis for petitioners' argument that the Delaney amendment, or at least the principle it embodies, applies to pesticide chemicals. Just prior to Thanksgiving 1959, HEW seized substantial proportions of that year's cranberry crop because the cranberries contained residues of the weed killer pesticide aminotriazole. In announcing the legal basis for the Department's action, then Secretary of HEW Arthur Flemming took the following position:

"* * * Research has established the fact that the weed killer, aminotriazole, causes cancer in the thyroid of rats when it is contained in their diet.

"It is the Department's position that because such a chemical is unsafe, we cannot issue a regulation setting a tolerance for it when it causes cancer in man or animal. * * *

"This policy is basic in our food and drug law, and it was spelled out in the

---

15. Mrak Commission Report, at 11.

16. 21 C.F.R. §§ 120.147 to 120.147c (1969). DDT tolerances range from 50 parts per million in or on peppermint hay and spearmint hay which are not to be used for feeding livestock down to one part per million on artichokes, asparagus and other foods, and down to 0.05 part per million in milk.

17. The text of the Delaney amendment is set out in text *infra* at page 1091.

law itself when Congress recently passed the Food Additives Amendment. This included the following provision:

"[Delaney Amendment set out]

"*In endorsing this language, we told Congress this policy was already in force under the pesticide chemicals law without the above-quoted language.*"[18]

Shortly after the cranberry seizure, Secretary Flemming appeared before a congressional committee to testify in support of an extension of the Delaney amendment to the color additives portion of the FDCA.[19] (The original Delaney amendment applied to food additives.) In his testimony, Secretary Flemming emphasized that scientifically there was no way to determine a "safe" level for a substance known to produce cancer in animals.[20] Relying on this scientific finding, Flemming again told Congress that HEW would be required to apply the no-carcinogen policy even absent the explicit statutory command:

"According to advice of our scientists, the principle of the * * * anticancer (Delaney) proviso of the Food Additives Amendment reflects, basically, the current state of scientific knowledge, and we would therefore, except as noted below, feel constrained to apply the same principle even in the absence of this proviso, *and we do in*

*fact apply it in the administration of the Pesticide Chemicals Amendment which does not contain the proviso.*"[21]

While we agree that these events are not without legal significance, we do not think the Delaney anticancer amendment can be held to apply full force to pesticide chemicals. The Delaney clause was added, as we have noted, to the FDCA as part of the Food Additives Amendment of 1958 and reads, in pertinent part, as follows:

"* * * [N]o additive shall be deemed to be safe if it is found to induce cancer when ingested by man or animal, or if it is found, after tests which are appropriate for the evaluation of the safety of *food additives*, to induce cancer in man or animal * * *. * * * * "[22]

Two years later, in 1960, Congress added a similar prohibition on color additives which were found to induce cancer in test animals. But in both instances the statute explicitly excludes pesticide chemicals from the definition of the terms "food additive"[23] and "color additive."[24] This does not, however, end the matter. Rather, it means that the statutory standards to be applied are not the specific commands of the anticancer amendments, but. the general command contained in Section 408 of the FDCA, 21 U.S.C. § 346a.

■ Section 408 of the FDCA authorizes the Secretary of HEW to estab-

---

18. HEW News Release, Statement of Secretary Arthur Flemming, November 18, 1959. (Emphasis added.)

19. The anticancer clause covering color additives is codified at 21 U.S.C. § 376 (1964).

20. Hearings on Color Additives Before the House Committee on Interstate and Foreign Commerce, 86th Cong., 2d Sess., 501 (1960).

21. H.R.Rep. No. 1761, 86th Cong., 2d Sess., Appendix, 2 U.S.Code Cong. & Ad.News, pp. 2887, 2936 (1960). (Emphasis added.)

22. 21 U.S.C. § 348(c) (3) (a). (Emphasis added.)

23. "The term 'food additive' means * * * except that such term does not include—

"(1) a pesticide chemical in or on a raw agricultural commodity; or

"(2) a pesticide chemical to the extent that it is intended for use or is used in the production, storage, or transportation of any raw agricultural commodity * * *"

21 U.S.C. § 321(s).

24. 21 U.S.C. § 321(t).

lish tolerances for pesticide residues on or in raw agricultural commodities "to the extent necessary to protect the public health." The section also authorizes the setting of a zero tolerance (no residue) level "if the scientific data before the Secretary does not justify the establishment of a greater tolerance." We need not pause to plumb the obvious ambiguities in this language since both Senate and House Committee Reports make the intended meaning of this section indisputably clear:

> "Before any pesticide-chemical residue may remain in or on a raw agricultural commodity, scientific data must be presented to show that the pesticide-chemical residue is safe from the standpoint of the food consumer. The burden is on the person proposing the tolerance or exemption to establish the safety of such pesticide-chemical residue." [25]

■■■ In this context, we think the events of the late 1950's indicate administrative action entirely consistent with, if not required by, Congress' expressed intent. At that time, Secretary Flem-

ming indicated that there was no scientific basis for determining a "safe" residue level for a chemical known to produce cancer in experimental animals.[26] Under such conditions, it would obviously be impossible to meet the congressionally imposed burden of establishing the safety of a residue of such a pesticide. On remand, therefore, the Secretary must consider the scientific evidence presented and determine whether continued tolerances for DDT are consistent with the intent of Congress.[27] If the evidence demonstrates that DDT is a carcinogen and the Secretary proposes to continue in effect any DDT tolerances on raw agricultural commodities, he would, of course, be required to explain the basis on which he determined such tolerances to be "safe."

The petition for review is granted, the order of the Secretary of HEW is reversed, and the case is remanded with instructions to publish petitioners' proposal in the Federal Register and commence the administrative process contemplated by the provisions of the Food, Drug and Cosmetic Act.

So ordered.

---

25. H.R.Rep. No. 1385, *supra* Note 8; S. Rep. No. 1635, *supra* Note 8, U.S.Code Cong. & Admin.News 1954, p. 2629.

26. We also note that HEW, shortly after enactment of the pesticide chemicals amendments to the FDCA, promulgated the following regulation:
 " * * * A zero tolerance for a pesticide chemical in or on a raw agricultural commodity may be established because * * *:
 * * * * *
 "(b) The chemical is carcinogenic to or has other alarming physiological effects upon one or more of the species of the test animals used, when fed in the diet of such animals."
 21 C.F.R. § 120.5 (1969).

27. In light of Congress' strong concern about the safety of pesticide residues and the congressional intent to place the burden of persuasion on those proposing to permit a residue to remain, the fact that the present petition seeks revocation of an existing tolerance does not affect the burden of persuasion established by Congress. *See* Note 8, *supra*. Once new evidence bearing on the safety of pesticide residues has been adduced or cited sufficient to justify reopening the issue of the validity of existing tolerances, as in the present case, the burden of establishing the safety of any tolerance remains on those who seek to permit a residue. In this connection, we note that the statute itself explicitly requires that the procedures for amending or repealing tolerances should be the same as those for establishing tolerances. 21 U.S.C. § 346a(m).