UNITED STATES of America, Plaintiff-Appellee,

v.

Harold A. GOODMAN, Sr., Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

STREGE & ROUSAR FISH COMPANY et al., Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Raymond S. STREGE, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Robert E. STREGE, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

G AND M FISHERIES et al., Defendant-Appellant.

No. 73-1008.

United States Court of Appeals, Seventh Circuit.

Argued June 13, 1973.

Decided Sept. 28, 1973.

Gregory B. Hovendon, Chief, Consumer Affairs Section, U. S. Dept. of Justice, Washington, D.C., David J. Cannon, U. S. Atty., Milwaukee, Wis., Charles J. Raubicheck, Washington, D.C., for plaintiff-appellee.

Before FAIRCHILD and SPRECHER, Circuit Judges, and GRANT, Senior District Judge.[*]

SPRECHER, Circuit Judge.

This appeal presents the problem of whether the Administrator of the Environmental Protection Agency (EPA) must establish by regulation permissible tolerances of DDT and its derivatives in fish before injunctive relief may be granted or whether instead the Secretary of the Department of Health, Education and Welfare (HEW) may enforce an interim enforcement guideline issued by the Food and Drug Administration (FDA) establishing a maximum amount of 5 parts per million of DDT residue in fish shipped in interstate commerce.

I

█ The federal government regulates the use of pesticides through three statutes, two of which are the Federal Food, Drug, and Cosmetic Act (FDCA),[1] administered by the Secretary of HEW, and the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA),[2] originally administered by the Secretary of Agriculture.

Pursuant to Reorganization Plan No. 3 of 1970, effective December 2, 1970,[3] EPA was established and there was transferred to it (1) the functions vested in the Secretary of HEW "of establishing tolerances for pesticide chemicals" under FDCA, together with authority "to monitor compliance with the tolerances and the effectiveness of surveillance and enforcement"[4] and (2) the

Adrian P. Schoone, Racine, Wis., for defendants-appellants.

[*] Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. 21 U.S.C. § 301 et seq.

2. 7 U.S.C. § 135 et seq.

3. 5 U.S.C. Appendix at 609 (1970).

4. Section 2(4), 5 U.S.C. Appendix at 610 (1970).

functions vested in the Secretary of Agriculture under FIFRA.[5]

However, the Secretary of HEW continues to administer FDCA except for EPA's establishing of tolerances for pesticide chemicals, and inasmuch as EPA only "monitor(s) compliance,"[6] the Secretary of HEW continues to enforce compliance. The FDA has acted as the delegate of the Secretary of HEW in enforcing the pesticide tolerances promulgated by EPA.

The Federal Environmental Pesticide Control Act of 1972,[7] providing for "the more complete regulation of pesticides in order to provide for the protection of man and his environment and the enhancement of the beauty of the world around him,"[8] invested EPA with power to prohibit misuse of a registered pesticide in addition to the existing powers of registering certain pesticides and prohibiting interstate commerce in unregistered pesticides. EPA has thus become the Congressionally designated expert on pesticides.

In passing the 1972 Act, Congress noted:[9]

"While appropriate pesticides properly used are essential to man and his environment, many constitute poisons that are too dangerous to be used for any purpose. Others are dangerous unless used extremely carefully, and some may have long lasting adverse effects on the environment. Some may be taken up in the food chain and accumulated in men and other animals. . . . Pesticides therefore have im-portant environmental effects, both beneficial and deleterious. Their wise control based on a careful balancing of benefit versus risk to determine what is best for man is essential."

## II

Upon the complaints of the United States, the district court in this case, at the conclusion of a trial without a jury, entered findings and conclusions and permanently enjoined five distributors[10] of fish known as raw chubs from distributing in interstate commerce such fish in which the total amount of DDT and its derivatives exceeds the interim limit of 5 parts per million. This limit was established by the FDA for all fish pursuant to an announcement to the public on April 22, 1969. United States v. Goodman, 358 F.Supp. 250 (E.D.Wis. 1972).

The district courts of the United States have jurisdiction, for cause shown, to restrain violations of section 331 of the Food, Drug and Cosmetic Act (21 U.S.C. § 332(a)). Among other prohibited acts, section 331(a) prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated . . . ." Section 402 of FDCA provides in part that:

"A food shall be deemed to be adulterated—

"(a) . . . (2) . . . (B) if it is a raw agricultural commodity and it bears or contains a pesticide

5. Section 2(8)(i), 5 U.S.C. Appendix at 610 (1970).

6. According to Webster's Third New International Dictionary, "monitor" means primarily to "check."

7. Pub.L. 92–516, 86 Stat. 975, 7 U.S.C. § 136 et seq. (Supp. II 1972) (effective October 21, 1972).

8. S.Rep.No.92–838, 92nd Cong., 2d Sess., 3 U.S.Code Cong. & Ad.News 3995 (1972).

9. S.Rep.No.92–838, 3 U.S.Code Cong. & Ad. News 3996 (1972).

10. A sixth defendant was also tried and permanently enjoined in District Court No. 71–C–158 but since that defendant, Ewig Bros. Co., Inc., distributed *smoked* chubs instead of raw chubs, which raises different issues, we have this day entered an order holding that appeal for decision with the pending appeal from United States v. Vita Food Products of Illinois, Inc., 356 F.Supp. 1213 (N.D.Ill.1973), which also involves smoked chubs.

chemical which is unsafe within the meaning of section 346a(a) of this title . . . ."[11]

21 U.S.C. § 342(a)(2)(B).

The parties stipulated that raw chubs are food, that raw chubs are raw agricultural commodities, that DDT and its derivatives are pesticide chemicals and that the defendants have repeatedly shipped foods containing an excess of 5 parts per million of DDT.

A pesticide chemical is deemed "unsafe" by FDCA as follows:

"(a) Any poisonous or deleterious pesticide chemical which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of pesticide chemicals, as safe for use, added to a raw agricultural commodity, shall be deemed unsafe for the purposes of the application of clause (2) of section 342(a) of this title unless—

"(1) a tolerance . . . has been prescribed [by regulations promulgated] by the Administrator of the Environmental Protection Agency under this section and the quantity of such pesticide chemical in or on the 'raw agricultural commodity is within the limits of the tolerance so prescribed; or

(2) . . . the pesticide chemical has been exempted from the requirement of a tolerance [by regulations promulgated] by the Administrator under this section."

21 U.S.C. § 346a(a). The parties stipulated that there is neither a regulation nor an exemption covering the situation at issue. It was further stipulated that the granting of injunctions in this case would have an adverse effect on sub-

stantial property rights of all of the defendants.

The issue which remained to be resolved at the trial was, did the raw chubs distributed by the five defendants contain a poisonous or deleterious pesticide chemical which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of pesticide chemicals, as safe for use?

### III

The pesticide DDT[12] is a chloride napthalene compound discovered in the late nineteenth century and first introduced in the United States about 1942 as the result of the seizure during World War II of some powder that was being used by the German army in North Africa as lice powder.

It thereafter became "one of the most widely used chemicals to control various insect populations and to protect agricultural crops from destruction by insects" but "[r]ecent scientific studies have . . . raised serious questions about the effect on the environment and on human health of the continued use of DDT." Environmental Defense Fund, Inc. v. United States Department of HEW, 138 U.S.App.D.C. 381, 428 F.2d 1083, 1085 (1970).

On April 22, 1969, the FDA issued in the form of a public press release a "guideline" establishing 5 parts per million as the maximum amount of DDT permissible in fish shipped in interstate commerce. In part the release stated:[13]

"The interim limit has been established primarily because of high residues of DDT and its derivatives found in coho salmon from Lake Michigan.

---

11. 21 U.S.C. § 321(r) provides in part:
"The term 'raw agricultural commodity' means any food in its raw or natural state . . . ."

12. DDT is an abbreviation for dichloro-diphenyl-trichloroethane.
The pesticide controversy is chronicled in Carson, Silent Spring (1962); Rudd, Pesticides and the Living Landscape (1964); Mellanby, Pesticides and Pollution (1967); Graham, Since Silent Spring (1970).

13. See United States v. Vita Food Products of Illinois, Inc., 356 F.Supp. 1213, 1216 (N.D.Ill.1973).

"This guideline is intended to protect the public from excessive levels of DDT in fish while a full scientific review is completed, Food and Drug Commissioner Herbert L. Ley, Jr., M. D. explained. It also gives the fishing industry a specific standard. Fish carrying residues higher than 5 ppm will be subject to seizure.

"The F.D.A. has asked the National Academy of Sciences—National Research Council to nominate a panel of experts to carry out the review of DDT residues in fish. The 5 ppm interim limit may be changed as the result of that study, Dr. Ley said."

A summary of the evidence in the district court is as follows:

Dr. Frederick Coulston is the Director of the Institute of Experimental Pathology and Toxicology at Albany Medical College, Alamagordo, New Mexico. The Institute was established in 1963 for the sole purpose of studying the safety of chemicals, drugs, and food additives, including pesticides. Dr. Coulston has B. A., M.A. and Ph.D. degrees. He is a professor of pathology, pharmacology and toxicology, a member or fellow of 12 professional societies, the author of 80 articles in professional journals, and active in a host of professional endeavors for organizations such as the World Health Organization and the National Academy of Sciences.

Dr. Coulston testified that he was a member and eventually the chairman of the Joint FAO/WHO (Food and Agriculture Organization and World Health Organization of the United Nations) Expert Committee which decided in 1969 that DDT should be phased out as harmful to animals and plants in the biosphere; that in his opinion as an expert DDT in excess of 5 parts per million in raw chubs is not generally recognized as safe; and that he knows of no evidence nor scientific literature that would indicate that it is generally recognized as safe in such amounts.

Upon cross-examination, he testified that he could not distinguish as to what level might be considered safe, since "[i]f I have five parts [per million] of a piece of fish and something creeps in from something else and something else, eventually the body burden gets very great . . . ."

Dr. Oscar Garth Fitzhugh is a toxicological consultant for the Environmental Protection Agency with B.S., M.S. and Ph.D degrees. He has taught pharmacology and physiology, is a member or fellow of five professional societies, the author of 112 articles on toxicology in professional journals, and the recipient of 7 awards in the fields of pesticides, toxicology and health. Dr. Fitzhugh has been a member of the World Health Organization Expert Committees on Food Additives and on Pesticides Residues, and the United States delegate on both the Codex Committee on Food Additives and on Pesticide Residues.

Dr. Fitzhugh testified that a toxicologist determines the safety of various materials; that his special purpose has been to establish the safety of materials primarily in food; that from 1939 to 1964 he was in direct supervision of the Food and Drug Administration laboratory on chronic toxicity and beginning in 1942 the laboratory was concerned with the toxicity of DDT; that studies show that DDT has a marked effect on the central nervous system of animals; that if doses are high enough, animals show extreme nervousness, coma and then death; that the central cells of the liver degenerate resulting in death from liver damage; and that other studies show that DDT is toxicant.

Dr. Fitzhugh further testified that the Joint FAO/WHO Expert Committee on Pesticide Residues established in 1965 that the "acceptable daily intake" of DDT for human beings is .01 milligrams per kilogram of body weight per day. An average person weighs about 70 kilograms or 150 pounds so that the average safe intake is 0.7 milligrams per day. If a person eats a hundred grams of fish a day (approximately a quarter of a pound) containing 5 parts per mil-

lion of DDT, he will consume 0.5 milligrams per day of DDT.

In 1969, the World Health Organization changed the acceptable daily intake to one-half of the original level or to .005 milligrams per kilogram of body weight per day.

Dr. Fitzhugh further testified that in his opinion, as an expert, DDT in excess of 5 parts per million in raw chubs is not generally recognized as safe; that he knows of no scientific literature that would indicate it is generally recognized as safe in such amounts; and that such amounts are not recognized by experts to be safe for human consumption.

Upon cross-examination, he testified that there is a trace of DDT in all foods; that there is a feeling among toxicologists that DDT is unsafe because it probably causes cancer; and that the 5 parts per million interim tolerance guideline was established on April 22, 1969 and was announced to the public through a press release.

Mr. Leon D. Sawyer is the Pesticide Analytical Specialist for the Minneapolis District of the Food and Drug Administration. He received his B.S. degree in chemistry and did graduate work in pesticide analytical methodology at Georgetown University. He has been a chemist with FDA since 1964. He recently presented a paper on pesticide analysis at the Association of Official Analytical Chemists.

Mr. Sawyer testified that as part of his official responsibilities, he has analyzed virtually all types of foods; that at the normal screening level, he looks for DDT in foods at one-hundredth of one part per million; that DDT is not present above this level in all foods; and that no food other than fish has ever approached 5 parts per million in all of his laboratory studies of food samples.

Mr. Sawyer further testified that his headquarters of FDA began a survey of DDT levels in Lake Michigan chubs in May, 1971 which continued to July 1, 1972; that 61 samples of chubs were taken from different locations in Lake Michigan and analyzed; that 54 samples showed well over 5 parts per million of DDT; and that samples along the western shore of the lake were predominately over the 5 parts whereas those taken from the northeastern area of the lake were under 5 parts. The yearly average of DDT content in Chubs taken from five areas along the western shore were 6.00, 6.03, 6.98, 7.13 and 7.41 parts per million. Chubs taken from the northeastern area of the lake averaged 3.66 parts per million.

Upon cross-examination, Mr. Sawyer testified that from 1964 through 1970, he analyzed "a fairly good cross section of all types of foods sold in the United States . . . out of the super market"; and he confirmed that of these only fish tested out with DDT in excess of 5 parts per million.

The defendants called one witness, Mr. Francis B. Coon, who is a chemist employed as the head of the chemistry department of WARF Institute, Inc. He has a B.S. degree in food chemistry. WARF is a commercial testing laboratory offering services in food nutrition toxicology to clients for a fee.

Mr. Coon testified that WARF has run in excess of 40,000 tests for DDT and its derivatives from about 1952 to date; that they ordinarily use a screening level for DDT of .002 parts per million as opposed to Mr. Sawyer's level of .01 parts per million; that there have been cases where DDT residue has not been found in that amount; that such result occurs in a tenth of their samples; that WARF has run several hundred tests for DDT in raw fish from Lake Michigan and all fish tests have shown the presence of DDT since 1958.

Mr. Coon further testified that in his opinion the DDT in Lake Michigan comes from run-off, air deposits, spillage and dumping of residues and chemicals into the lake; that the residue attaches to small plant and animal life, which is eaten by larger forms and so on up the chain until fish eat the tainted form; and that as the matter moves up

from one form of life to another, the level of DDT increases so that when it reaches fish the level is rather high.

He testified that in his experience the level of DDT in food is declining but that most food samples do contain some level of DDT.

On cross-examination, Mr. Coon testified that although he said that a tenth of WARF's samples do not indicate the presence of DDT, the WARF method of testing does not assure accuracy at that level; that WARF's tests on Lake Michigan chubs showed the presence of DDT in excess of 5 parts per million in over 50% of the samples; that in his reading he found no references to a general recognition of safety at that level in chubs or in fish generally.

As a result of this evidence, the district court found that "DDT is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of pesticide chemicals, to be safe at levels in excess of five ppm in fish for human consumption."

The court concluded that raw chubs containing DDT in excess of 5 parts per million are an adulterated food under 21 U.S.C. § 342(a)(2)(B), that the introduction or delivery for introduction into interstate commerce of such chubs is in violation of § 331(a), and such introduction or delivery is subject to restraint pursuant to § 332(a).

The court added (353 F.Supp. 250, 251):

> "At the conclusion of the trial, I indicated that I was satisfied of the plaintiff's entitlement to judgment with but one reservation: I wanted to consider further the defendants' contention that 21 U.S.C. § 346a(b) made it mandatory for the administrator to promulgate the regulations establishing tolerances. I have now concluded that the defendants' interpretation is incorrect.

> \*     \*     \*     \*     \*     \*

> "Although the provisions of subsection (b) would seem, facially, to suggest a duty to promulgate regulations that contain tolerances, I am persuaded that the total statutory scheme contemplates a judicial obligation to enjoin the distribution of unsafe foods even in the absence of a formally promulgated regulation."

## IV

The only issue upon appeal is whether Section 346a of FDCA makes it mandatory for EPA to promulgate regulations establishing tolerances.

Both the government and the defendants relied upon the language of Section 346a which provides in part that the "Administrator shall promulgate regulations establishing tolerances with respect to the use . . . of . . . pesticide chemicals which are not generally recognized among experts . . . as safe for use . . . to the extent necessary to protect the public health." 21 U.S.C. § 346a(b). Section 346a(c) provides in part that the "Administrator shall promulgate regulations exempting any pesticide chemical from the necessity of a tolerance . . . when such a tolerance is not necessary to protect the public health."

The defendants contended that the use of the word "shall" establishes the mandatory requirement of regulations either (1) to set a tolerance at some level, (2) to exempt a particular pesticide from the necessity of any tolerance, or (3) as further provided in Section 346a(b) to "establish the tolerance . . . at zero level if the scientific data before the Administrator does not justify the establishment of a greater tolerance." They argued that a permanent injunction issued pursuant to standards promulgated by an "interim guideline" denied them the review procedures of 21 U.S.C. § 346a(d)(5) and § 346a(e).

The government on the other hand contended that the Administrator is to promulgate regulations "to the extent necessary to protect the public health" and that in the present situation that necessity has not occurred. The govern-

ment further contended that the EPA Administrator "may" issue regulations and that the defendants, who argued that they were entitled to the protection of the procedural requirements preceding the promulgation of a regulation, could "trigger" those requirements by requesting that the Administrator act, which they failed to do.[14]

Before evaluating the respective arguments regarding the interpretation of FDCA, it is pertinent to note the reasons why EPA, the expert agency regarding pesticides, has not up to this time promulgated any regulations establishing tolerances or exemptions for DDT.

EPA has recently banned almost all agricultural uses of DDT, effective December 31, 1972. 37 Fed.Reg. 13369 (July 7, 1972). This decision represented the culmination of almost three years of intensive administrative inquiry which resulted in the conclusion that the long-range risk of DDT at the present total volume of use is unacceptable and that DDT presents a carcinogenic[15] risk. 37 Fed.Reg. at 13375. Among the factors which the Administrator is required to consider when he does set a tolerance is "the other ways in which the consumer may be affected by the same pesticide chemical." 21 U.S.C. § 346a(b)(2). Because the degree of human exposure to DDT from sources other than fish will undoubtedly soon change, an in-depth consideration of DDT tolerances during this period of fluctuation would be virtually meaningless.

Also there was evidence presented at the trial that there are several significant studies currently being conducted by the World Health Organization of the United Nations to determine the probable cancer-causing effects of DDT. It is prudent to wait for at least some of these studies before setting definitive tolerances for DDT in raw foods.

Under the defendants' interpretation of FDCA, the EPA is not given any flexibility with regard to the timing of establishing tolerances or exemptions. The EPA must proceed according to the requirements of 21 U.S.C. § 346a(b)–(c) before HEW is able to exercise any control over the introduction into interstate commerce of commodities containing unsafe pesticide chemicals. This interpretation renders 21 U.S.C. § 346a(a) meaningless. This section clearly provides that a pesticide chemical which is not generally recognized as safe for use, added to a raw agricultural commodity, shall be deemed unsafe *unless* EPA has established a tolerance or provided for exemption. Only in the absence of such action by the EPA is this section activated.

The defendants contend that this construction denies them the review procedures of Section 346a(d), but (d) applies only to persons who have registered an economic poison under FIFRA. The defendants, who could hardly have been unaware of the growing national concern over DDT content in fish, could have triggered the rule making procedure under 21 U.S.C. § 346a(e) if they had but requested it.

The language of Section 346a(b) provides for promulgation of regulations establishing tolerances "to the extent necessary to protect the public health." EPA has determined that a regulation for DDT in raw fish is not necessary at this time. In fact, they have refrained from promulgating such a regulation because DDT levels in the environment are in a state of flux, a state partially induced by their other control activities concerning DDT.

In the absence of a tolerance or exemption, the Secretary of HEW is

14. Section 346a(e) provides in relevant part that the "Administrator *may* at any time, *upon his own initiative or upon the request of any interested person, propose the issuance of a regulation establishing a* tolerance for a pesticide chemical or exempting it from the necessity of a tolerance. . . ." 21 U.S.C. § 346a(e) (emphasis added).

15. Tending to produce cancer.

charged with the enforcement of the ban of interstate shipment of adulterated agricultural commodities. 21 U.S.C. § 331(a). Although the cancer aspects of DDT are frightening,[16] the obvious solution to that problem, that is, a total ban on foods containing DDT, is not available. Virtually, every food contains some DDT.[17] The Administrator is required by Section 346a(b)(1) to consider "the necessity for the production of an adequate, wholesome and economical food supply . . . ." in setting tolerances. DDT has presented, and apparently will continue to present, a massive dilemma both for EPA and for society. Since there is no tolerance or exemption for DDT in fish, *any* amount of this poisonous pesticide chemical must be deemed unsafe and result in an adulterated product under a literal interpretation of the statute. Yet is obvious that at the present time *all* fish can not be banned inasmuch as it would seriously affect the total food supply.

In considering the parallel problem posed by Section 342(a)(3), defining an adulterated food as consisting in whole or in part of any filthy, putrid, or decomposed substance, we early said in United States v. 1,500 Cases, 236 F.2d 208, 210–211 (7th Cir. 1956):

"It sets a standard that if strictly enforced, would ban all processed foods from interstate commerce. A scientist with a microscope could find filthy, putrid and decomposed substances in almost any canned food we eat."

After quoting from our opinion, the Court of Appeals for the Fifth Circuit recently concluded in United States v. 484 Bags, 423 F.2d 839, 841 (5th Cir. 1970):

"Unjustifiably harsh consequences of a completely literal enforcement are tempered by discretion given the Secretary (now the Secretary of Health, Education and Welfare). He is allowed to adopt administrative working tolerances for violations of which he will prosecute. 21 U.S.C. § 336; United States v. 449 Cases, Etc., 212 F.2d 567 (2d Cir. 1954); Dean Rubber Manufacturing Company v. United States, 356 F.2d 161 (8th Cir. 1966). The courts may accept the administrative tolerance as a proper judicial measure of compliance with the Act. United States v. 1500 Cases, More or Less, Etc., 236 F.2d 208 (7th Cir. 1956); United States v. 935 Cases, Etc., 65 F.Supp. 503, 505 (N.D.Ohio 1946)." [18]

The defendants now contend that although the Commissioner of Food and Drugs has the undoubted authority to prohibit the distribution of all fish with any DDT residue, they are harmed because he has given them the opportunity to continue to operate if they can distribute fish with 5 or less parts per million of DDT residue. This action is consistent with specific statutory authority in the Act empowering him to refrain from prosecuting minor violations. 21 U.S.C. § 336 (see n. 18, *supra*).

16. Congress has indicated its concern for this problem as related to food additives, providing that "no additive shall be deemed to be safe if it is found to induce cancer when ingested by man or animal . . . ." 21 U.S.C. § 348(c)(3)(A).

17. "21 C.F.R. §§ 120.147 to 120.147c (1969). DDT tolerances range from 50 parts per million in or on peppermint hay and spearmint hay which are not to be used for feeding livestock down to one part per million on artichokes, asparagus and other foods, and down to 0.05 part per million in milk."

Environmental Defense Fund, Inc. v. United States Dep't HEW, 138 U.S.App.D.C. 381, 428 F.2d 1083, 1090, n. 16 (1970).

18. Section 336 provides that "[n]othing in this chapter shall be construed as requiring the Secretary to report for . . . injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning." 21 U.S.C. § 336.

We conclude that the Commissioner of Food and Drugs, as the delegate of the Secretary of HEW, had the authority under FDCA to abide by the interim guidelines, that in so doing his acts were not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or without observance of procedure required by law, and that the district court's findings are not clearly erroneous.

The judgments of the district court in the five cases are affirmed.

Affirmed.