**UNITED STATES of America,
Plaintiff,**

v.

**VITA FOOD PRODUCTS OF ILLINOIS, INC., a corporation, and Lawrence T. Schweig, an Individual, Defendants.**

**No. 70 C 2246.**

United States District Court,
N. D. Illinois, E. D.

Feb. 14, 1973.

James R. Thompson, U. S. Atty., Robert B. Schaefer, Asst. U. S. Atty., Chicago, Ill., Charles J. Raubicheck Forrest T. Patterson, Food and Drug Administration U. S. Dept. of Health, Education, and Welfare, Rockville, Md., for plaintiff.

Patrick W. O'Brien of Mayer, Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

The proceedings upon which the following opinion is rendered are based upon a Complaint for Injunction filed by the United States of America under Section 302(a) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 332(a), (hereinafter referred to as the Act), which invests this Court with jurisdiction to enjoin and restrain violations of Section 301 of the Act, 21 U.S.C. § 331.

Defendant, Vita Food Products of Illinois, Inc., is an Illinois corporation. Defendant, Lawrence T. Schweig, is vice-president of the corporation.

The government alleges that the defendant receives after shipment in inter-

state commerce, articles of food consisting of fish, known as chubs, and distributes them for human consumption and that these chubs are adulterated within the meaning of 21 U.S.C. § 342 (a)(2)(C) in that they contain food additives, namely the chemical substances, DDT, derivatives of DDT, and dieldrin, which are unsafe within the meaning of 21 U.S.C. § 348(a). The government further alleges that the above-named additives and their use and intended use are not in conformity with a regulation or exemption issued pursuant to 21 US.C. § 348(a), "since the total amount of DDT and its derivatives present in said smoked chub is at a level in excess of the interim limit of 5 parts per million which was established by the Food and Drug Administration for all fish pursuant to an announcement to the public on April 22, 1969 and which is still in effect, and since the presence of dieldrin in smoked fish is not permitted by any regulation or exemption issued pursuant to 21 U.S.C. § 348(a)."

The government contends that the defendants violate 21 U.S.C. § 331(a) in that they introduce and cause to be introduced and deliver and cause to be delivered for introduction into interstate commerce smoked chubs which are adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C) and that defendants violate 21 U.S.C. § 331(k) in that they cause chubs, while held for sale after shipment in interstate commerce and containing the above-named chemical substances, to be prepared, packed and distributed as smoked chubs, which acts result in the smoked chubs being adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C).

A hearing was held pursuant to 21 U.S.C. § 335 on September 16, 1969 regarding the interstate shipment of smoked chubs which were alleged to contain the aforementioned chemical substances in excess of the amounts of 5 parts per million of DDT or derivatives or which contained dieldrin in excess of .3 ppm.

I

In effect, the government's theory is that the chubs involved herein are adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C) because DDT and dieldrin are "food additives" under the Act and second since "their use and intended use are not in conformity with a regulation or exemption" they are "unsafe" as a matter of law under the terms of 21 U.S.C. § 348(a).

Defendants' position is "that any traces of DDT and dieldrin in its smoked fish are not "food additives within the Act", and that the government's mode of procedure "seriously perverts the elaborate statutory scheme established by Congress to ensure the safety of food and food additives and that defendants are not now and have not in the past sold any 'adulterated' smoked fish."

Defendants contend that the government has tried to establish adulteration as a matter of law because it is unable to establish adulteration as a matter of fact and in so doing has ignored the statute.

21 U.S.C. § 342(a)(1) states as follows:

"A food shall be deemed adulterated —if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health; or (2)(A) if it bears or contains any added poisonous or added deleterious substance (other than one which is (i) a pesticide chemical in or on a raw agricultural commodity; (ii) a food additive; (iii) a color additive; or (iv) a new animal drug) which is unsafe within the meaning of Section 346 of this Title, or (B) if it is a raw agricultural commodity and it bears or contains a pesticide chemical which is unsafe

within the meaning of Section 346(a) of this title, or (C) if it is, or it bears or contains, any food additive which is unsafe within the meaning of Section 348 of this title. . . . "

21 U.S.C. § 348(a) states as follows: "A food additive shall, with respect to any particular use or intended use of such additives, be deemed to be unsafe for the purposes of the application of clause (2)(C) of section 342(a) of this title, unless—

(1) it and its use or intended use conform to the terms of an exemption which is in effect pursuant to subsection (i) of this section; or (2) there is in effect, and its use or intended use are in conformity with, a regulation issued under the section prescribing the conditions under which such additive may be safely used. While such a regulation relating to a food additive is in effect, a food shall not, by reason of bearing or containing such an additive in accordance with the regulation, be considered adulterated within the meaning of clause (1) of section 342(a) of this title."

DDT is a chemical pesticide which has been used since the early 1940's to control mosquitoes and other pests. Recently, the use of DDT has been reduced by approximately 80% in the United States (tr. 219) and as of January 1, 1972, due to an order of the Environmental Protection Agency, the use of DDT will be almost eliminated. DDT and its derivatives are found in virtually all living tissue. Studies show that these concentrations (8–10 parts per million) in man (tr. 180) are decreasing (tr. 863–66; 1185–86).

Dieldrin is a far more mysterious substance than DDT although like DDT it finds its way into certain organisms. The most that can be said of dieldrin at this juncture is that its effect has not been fully demonstrated.

On April 22, 1969, a "guideline" characterizing 5 ppm as the maximum amount of DDT permissible in fish shipped in interstate commerce was issued in the form of a press release by the F.D.A. In part the release stated:

"Residues of DDT (including derivatives) in fish shipped in interstate commerce will be limited to 5 parts per million (ppm) under an interim guideline announced today by the Food and Drug Administration.

"The interim limit has been established primarily because of high residues of DDT and its derivatives found in coho salmon from Lake Michigan.

"This guideline is intended to protect the public from excessive levels of DDT in fish while a full scientific review is completed," Food and Drug Commissioner Herbert L. Ley, Jr., M. D. explained "It also gives the fishing industry a specific standard. Fish carrying residues higher than 5 ppm will be subject to seizure. .

"The F.D.A. has asked the National Academy of Sciences—National Research Council to nominate a panel of experts to carry out the review of DDT residues in fish. The 5 ppm interim limit may be changed as the result of that study, Dr. Ley said."

In ruling on the statutory basis for the F.D.A.'s authority to issue its interim enforcement guideline the Court in United States v. City Smoked Fish Co., et al. (E.D.Mich., Memo.Op. 33669, pg. 6, 1970) said:

"Plaintiff concedes that this guideline is neither a 'regulation' which the Act empowers it to issue, nor any other species of administrative rule recognized by any relevant or pleaded statute. This guideline is not published in the Code of Federal Regulations, nor apparently in any other published compilation of administrative rules.

"Since there is no statutory authority to issue such an interim enforcement guideline, it follows that defendants' violation of law, if any, must be of the statute itself, in this case The Food, Drug and Cosmetic Act."

The Court therein found such violation of the statute. However, I find myself in disagreement with that deci-

sion and instead find that DDT and dieldrin are not "food additives" within the meaning of the Food, Drug and Cosmetic Act of 1939.

I have come to this conclusion after a careful analysis of the statute, the 1959 "Food Additives Amendment" and its legislative history and purpose.

I find it necessary to quote at this point from that legislative history:

" * * * This bill, if enacted, will require the processor who wants to add a new and unproven additive to accept the responsibility now voluntarily borne by all responsible food processors of first proving it to be safe for ingestion by human beings.

" * * * *

"The second flaw in existing law which has proved detrimental to consumers, the processors, and to our national economy and which this bill seeks to remove is a provision which has inadvertently served to unnecessarily proscribe the use of additives that could enable the housewife to safely keep food longer, the processor to make it more tasteful and appetizing, and the Nation to make use of advances in technology calculated to increase and improve our food supplies. Your committee agrees with the Food and Drug Administration that existing law should be changed to permit the use of such additives as our technological scientists may produce and which may benefit our people and our economy when the proposed usages of such additives are in amounts accepted by the Food and Drug Administration as safe." Senate Report No. 2422, 85th Cong., 2d Sess., 3 U.S.Code Cong. & Admin. News, p. 5301 (1958).

■ Thus, the purpose of the Amendment was two-pronged; to permit the use of food additives in safe quantities but only after tests for safety conducted before the food in which those additives are used is introduced into commerce.

Section 348 provides an elaborate procedure for evaluating the safety of "food additives". Thus, 21 U.S.C. § 348(b)(1) reads as follows:

"Petition for regulation prescribing conditions of safe use; contents; description of production methods and controls; samples; notice of regulation. . . ."

and contains elaborate procedures that must be adhered to by any person who intends to use a food additive and details the conditions under which such an additive may be safely used.

■ It is uncontroverted that defendants herein do not actually "add" DDT or dieldrin to its product. The chemicals in question are introduced into the chubs by the environment. In no way have the defendants been accused of nor do they deliberately use the named substances in connection with the preparation of their product.

The Committee reports which accompany the Food Additives Amendment deal with three different categories of "food additives".

"The legislation covers substances which are added intentionally to food. These additives are generally referred to as 'intentional additives.'

"The legislation also covers substances which may reasonably be expected to become a component of any food or to affect the characteristics of any food. These substances are generally referred to as 'incidental additives.'

"The principal examples of both intentional and incidental additives are substances intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food." Senate Rep. No. 2422.

Therefore, it may be seen that neither the "intentional" nor "incidental" category of "food additive" is applicable. It is not an "intentional" additive because there is no allegation that the defendants nor for that matter any other person or corporation add the named chemical substances to the chubs.

Nor may they be considered "incidental" additives because Congress clearly enunciated that only those substances deliberately used in the course of the manufacturing or distribution process would be within that category. It is indisputable that any DDT or dieldrin in defendants' chubs result from unintentional circumstances which occur prior to the fish being caught.

The third category of "additives" are "accidental" and the Senate Report states as follows in respect to such additives:

"On the other hand, substances which may accidentally get into a food, as for example, paints or cleaning solutions used in food processing plants, are not covered by the legislation. These additives are generally referred to as 'accidental additives', since these substances if properly used may not reasonably be expected to become a component of a food or otherwise to affect the characteristics of a food. If accidental additives do get into food, the provisions of the Food, Drug, and Cosmetic Act dealing with poisonous and deleterious substances would be applicable."

I find myself in agreement with defendants that if, indeed, DDT and dieldrin traces found in fish are to be considered "additives" in any sense, they must clearly be considered "accidental" ones and as such not a "food additive" under the Act. Thus, I am in disagreement with the government's contention that "as components of the defendants' chub, residues of DDT and dieldrin are incidental food additives governed by the food additive provisions of the Act." (Govt.'s post-tr. brief, pg. 30).

One of the government's witnesses Dr. Frederick Coulston stated that DDT's presence in the chubs is 'accidental' (tr. 245). Dr. Coulston testified as follows:

Q. Do you know, sir, from your studies and through your group, what the best thinking is as to how the DDT got there? (Into fish that are swimming in lakes).

A. Well, of course nobody rightly knows exactly how it got there. We can only suppose that the use of the DDT in spraying for environmental control of insects or in use on crops in the soil, eventually washed down into the rivers and then into the lakes * * * " (tr. 207).

Thus, the chemical substances DDT and dieldrin are not ones intended for use in "producing, manufacturing, packing, processing, transporting, or holding food." Congress was most explicit in its delineation of what constitutes an "intentional" or "incidental" additive.

21 U.S.C. § 321(s) defines "food additive" and expressly excludes—

"(1) a pesticide chemical in or on a raw agricultural commodity; or

"(2) a pesticide chemical to the extent that it is intended for use or is used in the production, storage, or transportation of any raw agricultural commodity * * *."

A case on point is one cited by defendant, United States v. Bodine Produce Co., 206 F.Supp. 201, 210 (D.C.Ariz. 1962) in which the Court stated that the DDT found in lettuce was not a "food additive":

" * * * By the Food Additive Amendment in 1958 * * * Congress tackled the problems of food additives in processed foods in depth. It drew a sharp line between the Food Additives Amendment and the Pesticide Chemicals Amendment. Thus in the definition of "food additive" it excluded pesticide chemicals in or on raw agricultural commodities. * * * "

In Environmental Defense Fund v. United States, 138 U.S.App.D.C. 391, 428 F.2d 1083 (1970), the Court stated:

" * * * the statute (21 U.S.C. § 321(s) explicitly excludes pesticide chemicals from the definition of the terms 'food additive' and 'color additive'."

The government has attached as Ex. D to its Trial Memorandum the ruling

in U. S. v. City Smoked Fish, *supra*, in which the Court found:

"It further appears that DDT found in *raw* chubs is a pesticide chemical and not a food additive within the meaning of the Act. However, the Court concludes that DDT found in *smokèd* chubs is a 'food additive', since the chubs are no longer in their raw or natural state as required by the Act."

I cannot agree. 21 U.S.C. § 342(a) states that a "pesticide chemical" remains a "pesticide chemical" within the meaning of the Act even after the "raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating or milling."

For the above stated reasons, I find that any traces of DDT or dieldrin found in defendants' chubs cannot be labeled a 'food additive' within the meaning of the Food, Drug and Cosmetic Act of 1938.

## II

■ The next issue to be resolved is that of whether or not the chubs in question fall within the purview of 21 U.S.C. § 342(a)(1), *supra*, a portion of which states:

"A food shall be deemed to be adulterated—If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health."

The government has alleged as follows:

"It should be noted that smoked chubs containing residues of DDT, its derivatives or dieldrin in excess of the enforcement guidelines need not be proven injurious to health to be adulterated under the Act. In a long line of cases, the federal courts have held that foods may be adulterated regardless of whether they are injurious to health, unless the particular statutory definition of adulteration expressly requires the Government to prove such injury (citing cases). Since 21 U.S.C. § 342(a)(2)(C) does not require such proof, no injury to health need be shown to establish the adulteration alleged in this case." (Govt's Tr. Memo., p. 20).

However, having found that 21 U.S.C. § 342(a)(2)(C) is not applicable, I find that injury to health must be shown in order for the government to prevail. The testimony on this issue was diverse and interesting but in the final analysis not as illuminating nor as definitive as might have been hoped.

■ Dr. Frederick Coulston, a toxicologist and one of the government's witnesses testified as to rumors that DDT might be a carcinogen:

"But its the uncertainty. I can only state that I know of no harm to man, human beings, from DDT even in larger amounts than five parts * * *." (Tr. 218).

Professor Rolf Hartung, another government witness testified as follows:

"There is at least one suggestive study by Poland who looked again at a series of pesticide formulators and reported that those people who had received 20 times the normal background level of pesticides did exhibit a slight increase in the rate in which they would metabolize these drugs.

\* \* \* \* \* \*

"Now this does not in any way imply safety either. The reason it doesn't imply harmfulness is because the effects are very subtle and we cannot make an easy judgment as to whether this is permanently hurting a person or not. I am dubious that it would personally hurt a person." (Tr. 297).

A short time later in the trial Professor Hartung stated:

"If we want to look for any evidence whatever as to what might be happening for man at normal types or close

to normal types of dosage, we are very hard put." (Tr. 299).

Dr. William Deichmann, an eminent toxicologist, testified in behalf of the defendant and stated during the trial that counsel for the government had telephoned him and:

"* * * told me that the Vita Food Company had been selling smoked fish which contained 7 or 8 parts per million DDT, and whether I would speak for Food and Drug Administration, since the permissible limit in smoked fish is 5 parts per million, and the primary issue was whether I could make the statement that the ingestion of smoked fish containing 7 or 8 parts per million is injurious to health.

"Q. And what did you say, sir?

"A. I told Mr. Raubicheck (government counsel) that if it is a question of whether the food company is guilty of exceeding the concentration, if that is the question, that I must agree that 7 or 8 is more than 5, and on that basis I would say they would be guilty, but if it is a question of health hazard of a concentration of 8 parts per million, that I couldn't support that, and for that reason I declined to testify for Food and Drug, and I wrote to Mr. Raubicheck a letter to that effect." (Tr. 844–45).

When asked his opinion as to the chronic toxicity of residues of DDT in human beings Dr. Deichmann responded:

"I could refer you to the studies that have been done where the concentrations, the retention rates in human beings, have been very much higher than those in the general population without any effect that the investigators and physicians tried to find and did not find." (Tr. 807).

In response to the question of whether he knew of any disease in humans attributable to DDT the witness replied:

"I have introduced this word on two occasions (DDT-itis), and I made the statement that there is no record of any DDT-itis in this country or any other country. . . ." (Tr. 807).

Again Dr. Deichmann testified:

"Nowhere in the world does this compound, and I am referring to DDT, present an 'imminent hazard' to public health—." (Tr. 852).

Thus, I cannot on the basis of the evidence tendered during the course of this trial unequivocally state that DDT is a known health hazard to man.

### III

■ A great portion of the trial revolves around the issue of the reliability of the test methodology used by the government to prove that the samples of Vita's chubs involved herein contained DDT concentrates in excess of 5 ppm. The government's test method is referred to as the "AOAC" method. Although I shall not go into a detailed analysis of the testing procedures I should like to note the following information that was gleaned from the trial testimony.

No method of testing has been proven to be absolutely reliable. Certain discrepancies that were raised during trial and in defendant's post-trial brief have led me to conclude that the AOAC method is capable of distinguishing between concentrations of DDT in the area of 4 to 9 ppm. Thus, there is always the possibility of a margin of error and I must hold that the AOAC method, when left to be followed by testers provided by food processors in all cases and utilized by government testers only in spot checking on the continuous batch upon batch testing to be performed by the food processors, is incapable of that degree of accuracy which ought to exist to support a court judgment enjoining a food processor from proceeding on in the industry.

Since September 1971, the American Meat Institute Laboratory (AMI) has been hired by Vita to analyze its chubs for pesticides, using the AOAC method. The AMI Laboratory also analyzes each of the samples which formed the founda-

tion for the case herein. Its analysis showed substantially lower results than did the comparable analysis performed by the FDA chemists. Four of the seven AMI analyses showed readings below 5 ppm and the highest of those above 5 ppm read 5.35. There are numerous other examples of differences between the various methods of testing. Differences in results tended to reflect differences between individual chemists performing the tests.

The concept "absolute reliability", like the phrases "unimpeachable preciseness" and "perfect certainty", is repugnant to the scientific mind. The most that should be looked for is "sufficient reliability"—reliability to a degree sufficient for the purpose to be served. The purpose to be served here is not served when the acknowledged degree of exactness has a coefficient of error of plus or minus 25%, and when various tests of the same samples with the same procedures performed by equally qualified persons result in readings varying over a range of one hundred percent.

From all the relevant data one fact stands out. It is that science has not developed a system which is sufficiently reliable. The AOAC's method is not sufficiently reliable for me to find by the greater weight of the evidence and as a controlling fact that the chubs sampled by FDA in April 1972 contained DDT concentrations in excess of 5 ppm.

There is in this case uncontradicted evidence tending to show that the level of Lake Michigan chubs generally is less than 5 ppm. Mr. Bernard Lorant, a chemist, testified that based upon all of the test results in evidence (FDA's AMI's, NMFS, and those of WARF) (Def. Ex. 29) the incidence of DDT and its analogs in Lake Michigan chub are at or below 5 ppm. (Tr. 1202–03).

### IV

In summary, I find that 21 U.S.C. § 342(a)(2)(C) is not applicable since DDT, derivatives of DDT and dieldrin found in Vita's smoked chubs are not "food additives" under the Act. I find that DDT, derivatives of DDT and dieldrin as found in Vita's smoked chubs are not a known health hazard within the meaning of 21 U.S.C. § 342(a)(1). I find that the test method to be used by processors of smoked chub is not sufficiently precise for a finding of fact that the chubs sampled in April 1972 contained DDT concentrations in excess of 5 ppm.

It should be made crystal clear that these findings do not open the gate to an area of abandonment of concern on the part of processors of food. Neither do they restrain the Food and Drug Administration from pursuing a severe program of monitoring processors of smoked fish in its effort to keep out of interstate commerce food that constitutes a known health hazard. I have been presented in this case just one matter and my findings are technical ones. By the greater weight of the evidence and by the applicable law the allegations of the complaint against these defendants have not been sustained.

This Memorandum Opinion shall constitute my findings of fact and conclusions of law.