502 F.2d 715
 6 ERC 2073, 4 Envtl. L. Rep. 20,763
 UNITED STATES of America, Plaintiff-Appellee,
v.
EWIG BROS. CO., INC., a corporation, and Eugene W. Ewig, an
individual, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
VITA FOOD PRODUCTS OF ILLINOIS, INC., a corporation, and
Lawrence T. Schweig,an Individual, Defendants-Appellees.
 Nos. 73-1008, 73-1454.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 7, 1974.
Decided Aug. 28, 1974.
 
 Adrian P. Schoone, Racine, Wis., for appellants Ewig Bros. Inc. et al.
 Gregory B. Hovendon, Chief, Consumer Affairs Section, U.S. Dept. of Justice, Washington, D.C., David J. Cannon, U.S. Atty., Milwaukee, Wis., Charles J. Raubicheck, U.S. Dept. of H.E.W., Washington, D.C., for the United States in No. 73-1008.
 James R. Thompson, U.S. Atty., Gary L. Starkman and Robert B. Schaefer, Asst. U.S. Attys., Chicago, Ill., Gregory B. Hovendon, Chief, Consumer Affairs Section, U.S. Dept. of Justice, Charles J. Raubicheck, U.S. Dept. of H.E.W., Washington, D.c., for the United States in No. 73-1454.
 Patrick W. O'Brien, Chicago, Ill., for Vita Food Products of Ill., Inc. et al.
 Before HASTINGS, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.
 STEVENS, Circuit Judge.
 
 
 1
 There are two ways to state the principal question presented by these appeals. Narrowly, the issue is whether residues of DDT and dieldrin in smoked chubs are 'food additives' within the meaning of 201(s) of the Federal Food, Drug and Cosmetic Act.[1] A somewhat more disturbing way to state the same question is whether all of the fish in the Great Lakes are 'adulterated' as a matter of statutory definition.[2] If they are, the Administrator[3] may have, at least for the present, virtually unbridled power to eliminate all such fish from our food supply. We therefore attach special importance to the additional questions presented in the Vita Food appeal. That appeal, unlike the Ewig Bros. appeal,[4] requires us to consider the legal significance of an 'interim guideline' announced in a press release on April 22, 1969, as well as the district court's findings that the testing methods used by the government's experts were not sufficiently reliable to demonstrate that Vita's smoked chubs contained more DDT than the guideline permits.
 
 
 2
 A total ban on the future use of DDT would not resolve the problem presented by this case. Although the levels of DDT contamination are declining, we must assume that the chemical, or its derivatives, will survive as an ingredient of all or most foods for some time.[5]
 
 
 3
 Scientists seem to agree that if the DDT level is high enough, the food should not be consumed by man and, conversely, if the amount is sufficiently small, ingestion of DDT may be harmless. Danger levels have not been precisely defined. The record demonstrates, however, that in fish levels in the range of 5 parts per million are neither (a) generally recognized among qualified experts as safe,[6] nor (b) demonstrably injurious to health or unfit for human consumption.[7] At the levels disclosed by the record before us, the effect on human health is somewhat uncertain.
 
 
 4
 Unquestionably DDT is a 'pesticide chemical' as that term is defined in 201(q) of F.D.C.A. See 21 U.S.C. 321(q). Pursuant to statutory procedures, tolerances have been established for its use in or on various raw agricultural commodities, including fruits, vegetables, and meat.[8] Such foods may therefore contain DDT within the prescribed tolerance limits without being 'adulterated.' It does not follow, however, that a level which is either safe or unsafe for one food would be equally safe or unsafe for another food.[9] With respect to the foods for which DDT tolerances have been set, it is reasonable to infer that the rule-making process may have been invoked either by the FDA itself, by manufacturers or distributors of the pesticide, or by farmers or producers who are interested in using DDT as a pesticide. Fishermen, however, have never had any interest in using or selling DDT themselves; its presence in the environment is a condition of their work- and also of the business of distributing or processing fish- for which they are not responsible and which they have no interest whatsoever in perpetuating. In short, unlike farmers and pesticide salesmen, they have never had any interest in adding DDT to the environment or to the food supply. From their point of view, it is not an item which is added to their products; it is a natural component of the fish before it is caught, let alone processed.
 
 
 5
 In this case the government's claim that defendants' chubs are 'adulterated' is not predicated on a claim that the particular fish defendants sell contain a poisonous substance or are otherwise unfit for food pursuant to either subparagraph (1) or subparagraph (3) of 402 of the F.D.C.A.[10] Under those subparagraphs the government would have the burden of proving that the fish are actually harmful to man. Instead, the government's claim is predicated on 402(a)(2)(C),[11] under which it need only prove that 'such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures . . . to be safe under the conditions of its intended use . . ..' 201(s) of the F.D.C.A., 21 U.S.C. 321(s).[12]
 
 
 6
 It is the government's position that a fair analysis of the statutory scheme Congress has enacted, including the allocation of decision-making responsibility between the agency and the judiciary, justifies proceeding under this section. For if, as the government contends, DDT is a food additive, the Food and Drug Administration may itself decide when products containing quantities of DDT should be removed from public consumption, without having to rely upon the decisions- possibly inconsistent with one another- of different federal judges determining danger to health under (a)(1) and (a)(3) on a case-by-case basis.
 
 
 7
 The question, then, is whether DDT and dieldrin in defendants' processed fish are 'food additives' within the meaning of 201(s).
 
 I.
 
 8
 We have recently identified the principal purposes of the food additive amendment of 1958.[13] Neither the purpose to establish a procedure for premarketing clearance of untested food additives, nor the intent to permit the evaluation of such products to encompass a consideration of their benefits, as well as their potential for harm, seems directly relevant to the question before us. Rather, we are concerned with products which, at least primarily, were intended to be regulated as pesticide chemicals rather than as food additives. It is therefore appropriate to review the development of the pesticide chemical legislation enacted in 1954 as well as the food additive amendment itself.
 
 
 9
 Prior to 1938 a poisonous substance added to a food during processing would not cause adulteration unless the government could prove that the food itself, as opposed to the added substance, was unsafe.[14] After 1938, however, the statute has focused attention on the character of the added substance. Section 406 of the 1938 Act prohibited the use of poisonous or deleterious substances unless industry demonstrated that the substance was required for processing and also persuaded the Administrator[15] to issue a tolerance regulation permitting use in amounts below a specified level. Pending the promulgation of such a tolerance regulation, the addition of any poisonous or deleterious substance- even traces which could not possibly affect the safe character of the end product- constituted adulteration as a matter of law.[16] The 'per se' approach adopted in 1938 placed the burden of proving safety upon industry and, as a matter of procedure, mandated marketing delays until after formal administrative review could be completed.
 
 
 10
 Although the 1938 Act authorized the promulgation of regulations limiting the amount of pesticide residues that remain in or on food (since such chemicals were obviously 'poisonous or deleterious'), only one such regulation was actually issued during the subsequent 15-year period. The absence of such formal tolerance regulations was attributable, in part, to the expense and complexity of the rule-making procedure and, in part, to the required showing that use of the added substance be essential or unavoidable during processing.[17] Instead of employing the statutory procedure, the F.D.A. exercised practical control by means of an extra-legal system of unofficial and informal tolerances.[18]
 
 
 11
 The pesticide chemical amendment of 1954 was adopted to enable industry to make effective use of these poisonous products, even when not absolutely necessary, and to simplify, expedite, and improve the tolerance rule-making procedure[19] - as well as to remove uncertainty from the law.[20]
 
 
 12
 The 1954 Act created a category of added poisonous substances known as 'pesticide chemicals' and authorized their use in or on 'raw agricultural commodities' unless they were 'unsafe' within the meaning of a newly enacted 408.[21] That section provided that every pesticide chemical was 'unsafe' unless exempted by the Secretary or used within a tolerance limit prescribed by the Secretary. Except insofar as courts would continue to read a de minimis exception into the new requirements,[22] and except insofar as the Administrator would decline to prosecute minor violations, every pesticide chemical was unsafe and caused adulteration unless and until it was the subject of a tolerance and thereafter used in conformity with the tolerance. As a matter of practice, a large number of tolerances were promulgated; the use of DDT and dieldrin was thereafter lawful as long as residues of these pesticides on raw agricultural commodities did not exceed specified limits.[23]
 
 
 13
 Just as the pesticide chemical amendment in 1954 created a new category of added substances which automatically caused adulteration unless exempted or used in conformity with an established tolerance, so did the 1958 amendment create still another new category- food additives- which also, by definition, caused adulteration unless exempted or used within a prescribed tolerance. Section 402, describing adulterated food, was amended to include any food which bears or contains an 'unsafe' food additive, and every such additive was deemed unsafe unless used in compliance with a tolerance regulation issued under a new 409.
 
 
 14
 Thus, congressional efforts to define and regulate adulterated food in the 20 years before 1958 reflected a consistent desire to rationalize the law by reducing the circumstances in which the F.D.A. must prove actual danger to a quantity of food and by establishing a system of tolerances which will both protect the public and enable industry to operate effectively.
 
 
 15
 The legislative history of the 1958 Bill indicates concern about the difficulties present when dangerous substances could not be proscribed by per se rules.[24] Since Congress used broad language in order to eliminate such difficulties, we should not construe it narrowly. The language, set forth in full above,[25] defines a food additive as any substance, 'the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food . . ..' Although Congress was primarily concerned with substances used by a food processor, neither the language nor the history of the 1958 Act limits its application to such substances.[26] The words 'the intended use of which' are not confined, as they easily could have been confined, to use in food processing.
 
 
 16
 Vita has argued that a process, such as smoking, during which nothing new is added to a food, cannot 'transmogrify' a preexisting component of a food into an additive. But whether the food be fish, fruit, or meat, if the component is a pesticide chemical, we think that is exactly what Congress intended.
 
 
 17
 Although it may seem odd to place the label 'additive' on a chemical substance which was a component of the raw product and which is not changed by processing, Congress' choice of that label does not result in any 'transmogrification.' Before processing, DDT is a 'pesticide chemical' on a raw product; after processing, it is an 'additive.' Since there is no tolerance for DDT on fish, both before and after processing the presence of the DDT causes fish to be adulterated without any proof that it is actually unfit as food. Defendants' contention, if accepted, would result in the anomaly that a chemical such as DDT would adulterate all raw fish, but adulteration of processed fish would be determined on an uncertain case-by-case basis. We conclude that such a construction of the statute is illogical and unacceptable.[27]
 
 
 18
 This conclusion is confirmed by the full text of the description of products which are 'unsafe'- and therefore 'adulterated'- because they contain food additives. Subsection (a)(2)(C) of 402 provides that a food is adulterated:
 
 
 19
 '. . . if it is, or it bears or contains, any food additive which is unsafe within the meaning of section 409: Provided, That where a pesticide chemical has been used in or on a raw agricultural commodity in conformity with an exemption granted or a tolerance prescribed under section 408 and such raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating, or milling, the residue of such pesticide chemical remaining in or on such processed food shall, notwithstanding the provisions of sections 406 and 409, not be deemed unsafe if such residue in or on the raw agricultural commodity has been removed to the extent possible in good manufacturing practice and the concentration of such residue in the processed food when ready to eat is not greater than the tolerance prescribed for the raw agricultural commodity;'. 72 Stat. 1784.
 
 
 20
 Quite clearly the need for the proviso arose from the fact that the definition of a 'food additive' is broad enough to include any residue of a pesticide chemical remaining in or on food after processing. Prior to the 1958 amendment only raw agricultural commodities could be adulterated as a matter of law because of the presence of such an added chemical; processed foods were not subject to that risk. Accordingly, prior to 1958, the exemption for such pesticide chemicals used within tolerance limits on raw agricultural commodities was sufficient to avoid the risk of 'per se' adulteration for all food subject to that risk. But when the 'per se' concept was enlarged to encompass processed food, which might, of course, contain some chemical residue, it became necessary either (a) to make the 'food additive' and the 'pesticide chemical' categories mutually exclusive, or else (b) to enact a specific proviso to cover the area of overlap. Congress made the latter choice.
 
 
 21
 The proviso which Congress enacted avoids the necessity for duplicate tolerances, one covering the use of the chemical on the raw commodity and the second applying to the same chemical after processing. The fact that an express proviso was needed to avoid that consequence confirms our reading of the food additive definition as broad enough to encompass pesticide chemical residues in processed food.
 
 
 22
 Thus, the tolerances for DDT and dieldrin in or on raw fruits, vegetables, and meat are adequate to avoid adulteration caused by the residues remaining after the foods are processed. Without such tolerances, we think it is clear that the presence of DDT in or on such foods will cause adulteration pursuant to subparagraph (a)(2)(B) in their raw state, and that the same consequence will follow from subparagraph (a)(2)(C) after processing. We are also persuaded that these chemicals have the same impact on fish in the Great Lakes. As long as no tolerances have been established, the raw chubs are adulterated within the meaning of (a)(2)(B) because they contain an unsafe pesticide chemical; after processing, by virtue of (a)(2)(C), the chubs are adulterated because they contain an unsafe food additive. We think this is evident from the entire statutory scheme, the definitional language, and the relevant legislative history.[28] We hold, therefore, that the DDT and dieldrin found in defendants' smoked chubs were 'food additives' and, since not protected by any tolerance, the chubs were 'adulterated' as a matter of law.
 
 II.
 
 23
 Vita Food argues, in the alternative, that even if DDT and dieldrin are food additives, we should nevertheless affirm because the government failed to prove that residues of these chemicals exceeded the limits specified in the F.D.A. interim enforcement guidelines. In its opinion the district court stated that there is never 'perfect certainty' in any scientific analysis and that the government's test methods were 'not sufficiently reliable for me to find by the greater weight of the evidence and as a controlling fact that the chubs sampled by FDA in April 1972 contained DDT concentration in excess of 5 ppm.' 356 F.Supp. 1213, 1221.[29]
 
 
 24
 Neither party has contested the applicability of the F.D.A.'s 5 ppm enforcement guideline. Nevertheless, it is clear that the government might have argued that the enforcement guideline was merely adopted as an internal standard to determine when it would be appropriate to initiate an enforcement proceeding, and that publication in a Press Release was merely intended to give industry fair notice of its internal standards. By way of analogy, a police department might adopt a policy of not enforcing a 55 mile speed limit unless a motorist's speed exceeded 65 miles per hour. Under such a policy, at a trial it would not be necessary to prove anything more than a speed in excess of 55. By comparison, the F.D.A. might as a matter of discretion withhold enforcement unless it found residues of over 5 ppm, but have no legal obligation to prove anything more than a trace to establish statutory adulteration.[30]
 
 
 25
 We do not so interpret the interim guidelines before us in this case; for both the language of the Press Release[31] and the government's treatment of it in this case[32] indicates that it was meant to operate more like a rule of general applicability than a mere prediction of how the agency would choose to exercise its prosecutorial discretion.[33] Accordingly, even though the government was not obligated to adopt any interim guideline, and might have let industry accept the responsibility for initiating tolerance proceedings, it correctly assumed the burden of proving that appellant violated the specified limits.[34]
 
 
 26
 The district court considered the AOAC method of testing for chemical residues insufficiently precise for the government to sustain its burden. It is clear, however, that the enforcement guidelines must have been adopted on the assumption- shared by government and industry- that existing methods of testing DDT were sufficiently accurate to permit meaningful administration of the limits specified therein. The AOAC method was used by both the government technicians and by the expert employed by appellant. However imprecise that method may be, the record indicates that it is the best method that can be used. Certainly the government must be permitted to use the best testing method yet devised by analytical chemists, for the enforcement guidelines must have been predicated upon that method. Therefore, without disagreeing with the district court's observation that the AOAC method falls short of perfact certainty, we cannot accept the view that it may not be used to evaluate appellants' compliance with the guidelines. The district court's contrary determination was clearly erroneous.
 
 
 27
 Acceptance of the AOAC method as the proper standard for measuring residues of pesticide chemicals in fish leads inexorably to the conclusion that the government met its burden of proving repeated violations of the guidelines. In July and August of 1969, and again in the fall of 1969, the F.D.A. collected and analyzed smoked chubs shipped by Vita in interstate commerce and found quantities of DDT and its derivatives ranging from 5.97 ppm to 9.67 ppm. Tr. 663-665. After this case had been commenced, additional samples were analyzed and found to contain 5.37 to 9.28 ppm.[35] These samples were subsequently analyzed by an expert employed by appellant; he found that three out of the seven samples contained DDT in excess of 5 ppm and that the other ranged from 3.89 to 4.37. Finally, in October of 1972, samples were sent to Seattle for analysis with results ranging from 5.42 ppm to 6.54 ppm. Tr. 623.
 
 
 28
 Whether we accept the government's evidence at face value- and since we have held that the AOAC procedure is acceptable, and since the detailed records supporting the government's conclusion are in the record, there is persuasive reason to do so- whether we assume that the truth lies somewhere in between the views of the respective litigants' experts, or even if we take the defendants' evidence, it is perfectly clear that the limit specified in the 1969 guidelines has been violated. A shipper of processed food may violate the statute even if some, or even a majority, of its food is not adulterated. The evidence is uncontradicted that the Act as implemented by the guideline, has been violated.
 
 
 29
 Vita argues, however, that there really is no significant difference between DDT levels of 5 ppm and levels as high as 8 ppm. But that is an argument that should not be addressed to us; it may properly be asserted as a reason for setting a tolerance at 8 ppm or perhaps even higher. The F.D.A. need not have set its guideline limit at 5 ppm, but it did so, and industry has not seen fit to invoke the statutory procedures for establishing a different tolerance level. In these circumstances, the government has met its burden by proving that the guidelines have been exceeded repeatedly.
 
 
 30
 The judgment in United States v. Vita Foods is therefore reversed and remanded for the entry of appropriate relief. In view of the nature of the case and the trial judge's familiarity with the technical materials in the record, Circuit Rule 23 shall not apply.
 
 
 31
 The judgment in United States v. Ewig Bros. Co. is affirmed.
 
 
 
 [1]
 Section 201 of F.D.C.A., enacted as part of the 'Food Additive Amendment of 1958,' 72 Stat. 1784, is codified as 21 U.S.C. 321. The definition of 'food additive' reads as follows:
 (s) The term 'food additive' means any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case as a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use; except that such term does not include-
 (1) a pesticide chemical in or on a raw agricultural commodity; or
 (2) a pesticide chemical to the extent that it is intended for use or is used in the production, storage, or transportation of any raw agricultural commodity; or
 (3) a color additive; or
 (4) any substance used in accordance with a sanction or approval granted prior to September 6, 1958, pursuant to this chapter, the Poultry Products Inspection Act (21 U.S.C. 451 and the following) or the Meat Inspection Act of March 4, 1907, as amended and extended; or
 (5) a new animal drug.
 
 
 [2]
 Section 402 of F.D.C.A., 21 U.S.C. 342, defines adulterated food. The provisions of subparagraphs (a)(2)(B) and (a)(2)(C), which pertain, respectively, to pesticide chemicals on raw agricultural commodities and to food additives are relevant here; they are quoted in n. 11, infra
 
 
 [3]
 Enforcement responsibility presently resides in the Administrator of the Environmental Protection Agency. The respective functions of the Secretary of H.E.W., the Secretary of Agriculture, and the Administrator, and the transfers effected by Reorganization Plan No. 3 of 1970, effective as of December 2, 1970, are outlined in United States v. Goodman, 486 F.2d 847, 848-849 (7th Cir. 1973)
 
 
 [4]
 The Ewig Bros. case was brought as a companion to complaints filed against five other defendants which distributed raw chubs, as opposed to the smoked chubs distributed by Ewig. In all six cases, the parties stipulated that the quantity of DDT in the chubs exceeded the informal guidelines, and, in the five raw chub cases, that DDT was a 'pesticide chemical' and that the fish were 'raw agricultural commodities' within the meaning of 201 of F.D.C.A. (see 21 U.S.C. 321(q) and (r)). In all cases Judge Gordon rejected the defendants' argument that the Administrator was required by statute to establish tolerance limits for DDT in fish before he could claim that the presence of DDT residues resulted in adulteration. In the Ewig case, Judge Gordon also held that DDT in the processed chubs is a food additive. He entered permanent injunctions in all six cases
 On September 29, 1973, we affirmed the judgments in the five cases involving raw chubs and entered an order holding the Ewig appeal for decision with Vita Food. See United States v. Goodman, 486 F.2d 847, 849 n. 10. In that case we held that the Administrator is not required to establish by regulation permissible tolerances of DDT and its derivatives before initiating enforcement proceedings or obtaining injunctive relief in such a proceeding. Judge Sprecher's ipinion in that case describes the enforcement guideline, the evidence of growing national concern over DDT content in fish, and portions of the statutory scheme which could have been invoked by the raw chub distributors to establish tolerances for DDT residues in their products. The only contention raised by Ewig Bros. on this appeal is that Judge Gordon erroneously held that DDT residues in smoked chubs are a 'food additive.'
 
 
 [5]
 Concentration levels vary in different kinds of tissue. It is higher in Great Lakes fish than in most other foods, and especially high in the fat tissue and in fish caught in certain parts of Lake Michigan
 
 
 [6]
 See also United States v. Goodman, supra, 486 F.2d 851-853
 
 
 [7]
 The government made no effort to establish adulteration as defined in subparagraphs (a)(1) or (a)(3) of 402. See 21 U.S.C. 342
 
 
 [8]
 See 40 C.F.R. 180.147. Thus, for example, a tolerance of seven parts per million has been established for a number of items including 'fat of meat from cattle, goats, hogs, horses, and sheep . . . spinach, squash, . . .' and a tolerance of only one part per million for a number of other items, such as artichokes, peanuts and radishes. Tolerances have also been established for dieldrin. 40 C.F.R. 180.137
 
 
 [9]
 Different foods are, of course, consumed in differing quantities and absorbed into the body under differing conditions. The elimination of fat by consuming only filet of the fish, for example, may significantly reduce the intake of DDT
 
 
 [10]
 Sections 402(a)(1) and 402(a)(3), codified in 21 U.S.C. 342, provide:
 A food shall be deemed to be adulterated- (a) Poisonous, insanitary, etc., ingredients.
 (1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health;
 (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food.
 
 
 [11]
 That section, also codified in 21 U.S.C. 342, provides that a food shall be deemed adulterated
 (C) if it is, or if it bears or contains, any food additive which is unsafe within the meaning of section 348 of this title: Provided, That where a pesticide chemical has been used in or on a raw agricultural commodity in conformity with an exemption granted or a tolerance prescribed under section 346a of this title and such raw agricultural commodity has been subjected to processing such as canning, cooking, freezing, dehydrating, or milling, the residue of such pesticide chemical remaining in or on such processed food shall, notwithstanding the provisions of sections 346 and 348 of this title, not be deemed unsafe if such residue in or on the raw agricultural commodity has been removed to the extent possible in good manufacturing practice and the concentration of such residue in the processed food when ready to eat is not greater than the tolerance prescribed for the raw agricultural commodity . . ..
 Subsection (a)(2)(B) provides a similar standard:
 (B) if it is a raw agricultural commodity and it bears or contains a pesticide chemical which is unsafe within the meaning of section 346a(a) of this title . . ..
 
 
 [12]
 The government clearly met that burden in this case
 
 
 [13]
 See Continental Chemiste Corp. v. Ruckelshaus, 7 Cir., 461 F.2d 331, 340-341 (1972)
 
 
 [14]
 United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658
 
 
 [15]
 See n. 3, supra
 
 
 [16]
 To soften the impact of a rule which appeared to establish that food containing even traces of a deleterious substance was adulterated as a matter of law, some courts read the de minimis qualification which had existed under the previous statute, United States v. 133 Cases of Tomato Paste, 22 F.Supp. 515 (E.D.Pa.1938), into the new statute. See 338 Cartons, More or Less, of Butter v. United States, 165 F.2d 728 (4th Cir. 1947). See also United States v. 484 Bags, More or Less, 423 F.2d 839, 841 n. 1 (5th Cir. 1970)
 
 
 [17]
 The procedure before the 1954 amendments was described in the Senate Report as follows:
 Under existing law, added poisonous and deleterious substances- and most pesticide chemicals fall in this class- must be kept out of foods unless they are required in production or cannot be avoided by good manufacturing practice. When such a substance is required in production- as many pesticide chemicals are required in growing agricultural crops- a tolerance may be established by the Secretary of Health, Education, and Welfare, but only after a formal public hearing. Detailed findings of fact and conclusions must be made by the Secretary as to the required use of the pesticide and the residue levels that may safely be tolerated.
 Sen.Rep.No.1635, 83rd Cong., 2d Sess., 2 U.S.Code Cong. & Admin.News 1954, p. 2627.
 
 
 [18]
 This system was apparently authorized by 306 of the 1938 Act, codified as 21 U.S.C. 336, which provides:
 Nothing in this chapter shall be construed as requiring the Secretary to report for prosecution, or for the institution of libel or injunction proceedings, minor violations of this chapter whenever he believes that the public interest will be adequately served by a suitable written notice or warning.
 Some of the difficulties with this system are canvassed in Judge Frank's dissenting opinion in United States v. 449 Cases, Containing Tomato Paste, 212 F.2d 567, 575-581 (2d Cir. 1954).
 
 
 [19]
 The primary purpose of the bill is to assure greater protection of the public health by improving, simplifying, and speeding up the procedure under the Federal Food, Drug, and Cosmetic Act, for regulating the amount of residue which may remain on raw agricultural commodities after use of pesticide chemicals
 A primary objective in drafting the bill was to develop legislation that would provide for prompt administrative action to permit effective use of pesticide chemicals without hazard to the public health; legislation that would be safe for consumers and practical for producers.
 Sen.Rep.No.1635, 83rd Cong., 2d Sess., supra n. 17, at p. 2627.
 
 
 [20]
 Control . . . exercised through unofficial and informal tolerances . . . (, since) the necessary tolerances have not yet been issued . . . has been responsible for uncertainty under the law. It has handicapped the Government in enforcing the law, the grower in complying with the law, and the pesticide manufacturer and Federal and State agencies in discharging their responsibility for advising and making recommendations to the grower with respect to the use of pesticide chemicals
 Sen.Rep. No. 1635, 93rd Cong., 2d Sess., supra n. 17 at p. 2627.
 
 
 [21]
 This section is codified as 21 U.S.C. 346a
 
 
 [22]
 See n. 16, supra. We have found no case applying or refusing to apply the de minimis exception to products containing pesticide chemicals
 
 
 [23]
 See n. 8, supra
 
 
 [24]
 Under existing law the Federal Government is unable to prevent the use in foods of a poisonous or deleterious substance until it first proves that the additive is poisonous or deleterious. To establish this proof through experimentation with generations of mice or other animals may require 2 years or even more on the part of the relatively few scientists the Food and Drug Administration is able to assign to a particular problem. Yet, until that proof is forthcoming, an unscrupulous processor of foodstuffs is perfectly free to purvey to millions of our people foodstuffs containing additives which may or may not be capable of producing illness, debility, or death
 Sen.Rep.No.2422, 85th Cong., 2d Sess., 3 U.S.Code Cong. & Admin.News 1958, p. 5300.
 
 
 [25]
 See n. 1, supra
 
 
 [26]
 See the passage from the Legislative History of the Act, quoted in n. 28, infra. Note the use of the words 'principal examples' in the language which has been emphasized by Vita Foods
 
 
 [27]
 This court is acutely aware of the fact that it is not the proper body to more narrowly define broad standards in this area so that they can be applied in a particular case. Courts know neither what is necessary for the health of the consuming public nor what can reasonably be expected from the canning industry. Furthermore, this is not a determination that should be made individually for each case on the basis of expert testimony. The Food and Drug Administration should set definite standards in each industry which, if reasonable, and in line with expressed Congressional intent, would have the force of law
 United States v. 1,500 Cases More or Less, Tomato Paste, 236 F.2d 208, 211 (7th Cir. 1956).
 
 
 [28]
 Thus, for example, consider the excerpt from the Senate Report:
 Legislative History
 The legislation also covers substances which may reasonably be expected to become a component of any food or to affect the characteristics of any food. These substances are generally referred to as 'incidental additives.'
 The principal examples of both intentional and incidental additives are substances intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, transporting, or holding food.
 On the other hand, substances which may accidentally get into a food, as for example, paints or cleaning solutions used in food processing plants, are not covered by the legislation. These additives are generally referred to as 'accidental additives,' since these substances if properly used may not reasonably be expected to become a component of a food or otherwise to affect the characteristics of a food. If accidental additives do get into food, the provisions of the Food, Drug, and Cosmetic Act dealing with opisonous and deleterious substances would be applicable.
 Sources of radiation (including radioactive isotopes, particle accelerators and X-ray machines) intended for use in processing food are included in the term 'food additive' as defined in this legislation.
 Exempted from the scope of the legislation are (1) pesticide chemicals in or on raw agricultural commodities which are already covered by the pesticide chemicals amendment to the Federal Food, Drug, and Cosmetic Act (Public Law 518, 83d Cong.); (2) residues of pesticide chemicals unavoidably remaining on processed foods not in excess of tolerances prescribed by Food and Drug Administration for raw agricultural commodities; and (3) substances already approved under the provisions of the Federal Food, Drug, and Cosmetic Act or the Meat Inspection Act of March 4, 1907.
 The Secretary is given authority by this legislation to exempt by regulation food additives for investigational use by qualified experts when consistent with the public health.
 Sen.Rep.No.2422, 85th Cong., 2d Sess., supra n. 24, at p. 5304.
 
 
 [29]
 It is not clear whether it is completely accurate to characterize these observations in the district court's opinion as findings of fact. Since the court had held that DDT is not a food additive, the government could not prevail unless it proved that the quantity of DDT in Vita's smoked chubs made them unfit for food or injurious to health. Clearly, the government did not sustain that burden. Under the district court's view of the law, which we have rejected, its observations about the unreliability of the government's test methods and about the sufficiency of the evidence proving excessive residues of DDT were unnecessary to its decision. On the other hand, its finding 'that the test method to be used by processors of smoked chub is not sufficiently precise for a finding of fact that the chubs sampled in April 1972 contained DDT concentrations in excess of 5 ppm,' 356 F.Supp. at 1221, can fairly be termed an alternative ground for granting judgment for the defendants. For if DDT in processed food was not a food additive under 321(s), and if the government failed to prove it a known health hazard, a conclusion that the preponderance of the evidence did not sustain a conclusion that defendants' fish exceeded 5 ppm would have been unnecessary. If such a finding is in fact an alternative ground for decision, it must be sustained unless it is clearly erroneous. Rule 52(a), Fed.R.Civ.P
 
 
 [30]
 This appears to be F.D.A.'s position with respect to its 0.5 ppm guideline for mercury in swordfish, since it has contended that that guideline is without legal significance. See Hearings on the Effects of Mercury on Man and the Environment Before the Subcomm. on Energy, Natural Resources, and the Environment of the Senate Comm. on Commerce, 91st Cong., 2d Sess., pt. 1, at 36, cited in Note, Health Regulation of Naturally Hazardous Foods: The FDA Ban on Swordfish, 85 Harv.L.Rev. 1025, 1028-1029 (1972)
 
 
 [31]
 The 1969 Press Release stated in part:
 The interim limit of 5 ppm for DDT residues will apply to all fish marketed interstate. Pesticide monitoring by FDA, however, indicates that DDT residues are below 1 ppm in 90 percent of the fish marketed in this country.
 Tolerances for DDT residues in other foods vary from product to product. The tolerance is .o5 ppm for milk and 7 ppm for a wide variety of fruits and vegetables and in the fat of meat. FDA has taken steps to reduce a number of these where experience has shown that lower levels are practicable. App. 123.
 The 0.3 ppm enforcement guideline for dieldrin has been in existence for more than 20 years. App. 62. The Record discloses no reason why its legal significance is different from that for DDT.
 
 
 [32]
 The government engaged in a protracted evidentiary hearing for the purpose of establishing that Vita's fish contained DDT in excess of 5 ppm, without ever contending, so far as we can determine from the record, that such proceedings were unnecessary
 
 
 [33]
 The Press Release contains no language similar to that found in the 'Merger Guidelines' released by the Department of Justice to inform the business community of its enforcement policy for Section 7 of the Clayton Act: 'These guidelines are announced solely as a statement of current Department policy, subject to change at any time without prior notice . . ..' Department of Justice 'Merger Guidelines,' p. 1. See United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1073 (S.D.N.Y.1969)
 
 
 [34]
 Cf. Nixon v. United States, U.S. , 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); Vitarelli v. Seaton, 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012; United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681; United States v. Heffner, 420 F.2d 809 (4th Cir. 1970). We do not suggest that there is anything to prevent the F.D.A. from changing the guideline it has enunciated, or even from enforcing the statute Congress has enacted with no guideline at all. Although there are objections to enforcement in this way, see Judge Frank's dissenting opinion in United States v. 449 Cases Containing Tomato Paste, supra n. 18, the industry would clearly have a remedy in the statutory procedure for the establishment of tolerances. 21 U.S.C. 348. We hold only that, for purposes of this litigation, the Enforcement Guideline is binding upon F.D.A., notwithstanding the informal manner of its release, as if it were a general rule published in accord with the requirements of the Administrative Procedure Act
 
 
 [35]
 A check test, run by a second chemist, yielded a range from 6.06 ppm to 9.88 ppm. See Defendants' Ex. 15